UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-60276-CIV-COHN/SELTZER

DHL EXPRESS (USA), INC., an Ohio corporation,

    Plaintiff,

v.

EXPRESS SAVE INDUSTRIES, INC., a New
York corporation, JOHN DOES 1-50,

    Defendants.

_____/

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ITS CONTRACT CLAIMS AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS

**THIS CAUSE** is before the Court on Plaintiff's Motion for Summary Judgment on its Contract Claims [DE 56] and Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims [DE 58]. The Court has considered the Motions, the parties' related submissions, the argument of counsel before the Court on November 13, 2009, the record in this case, and is otherwise advised in the premises.

### I. BACKGROUND

DHL Express (USA), Inc. ("DHL") is a provider of air and ground pick-up and delivery services. To assist with its sales and support functions, DHL contracts with local resellers to market and sell DHL shipping services. Express Save Industries, Inc. ("ESI") was a domestic reseller of DHL's services. Pursuant to the Reseller Agreement

("Agreement"),¹ ESI was to promote DHL's services to its customers and engage in marketing activities to attract new customers. See Agreement § 4. In return, DHL was to "be responsible for servicing" such customers "in accordance with [DHL's] standard practices." Id. § 5.

In the fall of 2008, due to competitive forces and a downturn in the US market, DHL decided to cease domestic shipping services, while continuing its international shipping business. On or about November 10, 2008, DHL notified ESI and its other resellers and domestic customers that, effective December 10, 2008, DHL would no longer be providing domestic shipping.

According to DHL, in November 2008, ESI unilaterally decided to stop paying DHL. DE 56 at 2. As a result, ESI "has run up a debt in the amount of $258,134.80 that it flatly refuses to pay." Id. at 2. DHL brought this action to collect that sum, which DHL alleges is the amount past due from ESI for shipping services provided by DHL.

ESI responded by bringing ten counterclaims against DHL. Seven of ESI's counterclaims were based on DHL's alleged violations of the franchise law of seven different states. In ruling on DHL's Motion to Dismiss, the Court dismissed these seven counterclaims as preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 41713 ("ADA"), and the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501 ("FAAAA"). See DE 54. With respect to ESI's remaining counterclaims (breach of contract (Count I), breach of the implied covenant of good faith and fair dealing

---

¹ In December of 2001, ESI entered into the Agreement with DHL's predecessor, Airborne Express, Inc. ("Airborne"). DHL assumed the Agreement when DHL and Airborne merged in 2003.

2

(Count II), and tortious interference with advantageous business relationship (Count X)), the Court concluded that "the question of whether or not such claims fall outside the scope of the parties' bargain is best resolved at the summary judgment stage in light of the full record." Id. at 4.

ESI's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing are premised on the theory that DHL, pursuant to the Agreement, is contractually obligated to provide domestic shipping services through December of 2010, at which time the Agreement is set to end. ESI's counterclaim for tortious interference is based on a provision in the Agreement which provides that DHL will not "knowingly directly solicit the business or patronage of existing [ESI] accounts." Agreement § 5. In spite of this provision, ESI's claims that "DHL did contact, solicit and secure business from a number of ESI's international clients." DE 69 at 9.

## II. LEGAL STANDARD

The Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production

shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). According to the plain language of Fed. R. Civ. P. 56(e), the non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

### III. ANALYSIS

**1.     DHL's Motion for Summary Judgment on ESI's Counterclaims**

DHL argues that ESI's counterclaims "provide perfect examples of what Congress wanted to prevent when it enacted the Preemption Statutes." DE 58 at 3. Specifically, DHL contends that ESI's "counterclaims seek to regulate the most fundamental element of an air and ground carrier's service – whether, and on what terms, the carrier will provide service in the first instance. Counts I and II seek to impose on DHL requirements to continue certain delivery routes and services to which

DHL never agreed. Count X invokes common law state tort principles to stop DHL from providing air carrier services to former customers of [ESI]." DE 58 at 3.

In response, ESI argues that DHL is attempting "to use principals of federal preemption to shield itself from liability in this case." DE 69 at 1. ESI asserts that federal preemption does not shelter DHL "'from suits alleging no violations of state-imposed obligations, but seeking recovery solely on [DHL's] breach of its own, self-imposed undertakings.'" Id. (quoting American Airlines, Inc. v. Wolens, 513 U.S. 219, 228 (1995)). According to ESI, DHL's "'self-imposed undertakings' are precisely the matters at issue in this case." Id.

The Court will first address DHL's arguments concerning ESI's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. The Court will then turn to the issue of whether DHL solicited ESI's customers in violation of the Agreement.

### A. ESI's Counterclaims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

#### i. Preemption

The FAAAA preemption clause states that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier." 49 U.S.C. § 14501(c)(1). In adopting the FAAAA, Congress used the same language that is used in the preemption provision of the ADA. See Deerskin Trading Post, Inc., v. United Parcel Serv. of Am., Inc., 972 F. Supp. 665, 668 (N.D. Ga. 1997) (noting that the preemption provision of the FAAAA employs identical language to the preemption provision of the ADA). The ADA

5

preemption clause provides "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).[2]

The Supreme Court interpreted the scope of the ADA preemption provision and held that "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted under the ADA's preemption provision." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992). In Morales, the Supreme Court construed the preemption provision of the ADA as having a broad preemptive scope. Morales, 504 U.S. at 383.

"[A] state law claim, whether by a private individual or government entity, will be preempted if it involves the enactment or enforcement of the state law. If the law has a connection with or relation to airline [or common carrier] prices, routes or services even indirectly, it is preempted by the federal law." ABC Charters, Inc. v. Bronson, 591 F. Supp. 2d 1272, 1299 (S.D. Fla. 2008). "[R]outine breach of contract claims," however, are not preempted. Wolens, 513 U.S. at 232-233. The law regarding preemption

> stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach of contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

---

[2]   Because the preemption provisions of the ADA and the FAAAA contain similar language, courts that have interpreted the preemptive scope of the FAAAA have relied on cases that address the preemptive scope of the ADA. See, e.g., New Hampshire Motor Transport Ass'n v. Rowe, 448 F.3d 66, 80 (1st Cir. 2006); Desardouin v. United Parcel Serv., Inc., 285 F. Supp. 2d 153, 162 (D. Conn. 2003); Smith v. United Airlines, Inc., No. 00-50373, 2002 WL 31236392, at *2 (N.D. Ill. Oct. 3, 2002).

Id. at 232-33.

It is apparent that ESI's counterclaims, which assert that DHL is obligated to provide domestic shipping services through December 2010, impact DHL's routes and services. Therefore, the question before the Court is whether such an obligation can be located in the express terms of the Agreement "with no enlargement or enhancement based on state laws or policies external to the agreement." Id. at 233.

### ii.   The Agreement

The Agreement was executed for an initial term of five years, but ESI had the option to extend the Agreement up to nine years based on its sales performance. See Agreement § 2. "ESI satisfied the sale performance expectations outlined in the Agreement, and the term of the Agreement therefore was extended to nine (9) years, through December of 2010." DE 69-1 ¶ 16. DHL does not dispute this. See 79 ¶ 16. Rather, DHL asserts that "[t]his 'fact' is irrelevant to DHL's Motion for Summary Judgment." Id.

The text of the provisions in the Agreement relevant to the Court's analysis is set forth below:

1.   **DEFINITIONS**

   (a)   "Products and Services" means all products and services currently offered by [DHL] to the small business market.
   . . .

2.   **TERMS OF AGREEMENT**

   [DHL] authorizes RESELLER to sell products and services to RESELLER Accounts. [DHL] will provide service to RESELLER accounts and bill RESELLER for such services as set forth herein.
   . . .

5. <u>OBLIGATIONS OF [DHL]</u>

. . .

[DHL] shall be responsible for servicing customers generated by this program in accordance with [DHL's] standard practices.

. . .

6. <u>TERMS OF TERMINATION</u>

At any time during the period of this Agreement, in the event of a material breach of this Agreement that is not cured within sixty (60) days written notice of said breach, the notifying party may terminate this Agreement immediately.

Any party may terminate this Agreement immediately for any of the following reasons:

(a) Any party shall institute proceedings under any bankruptcy or insolvency laws;

(b) Any material amount of any party's facilities or inventory shall be attached, levied upon, seized or taken under any judicial process and such proceedings shall not be vacated or fully stayed within sixty (60) days thereof.

. . .

8(i). Entire Agreement

This Agreement contains the entire Agreement of the parties and supercedes all prior or contemporaneous agreements and understandings, whether written or oral. This Agreement may be amended only by a written instrument signed by the parties hereunder.

### iii. **The Court Cannot Conclude as a Matter of Law that DHL did not Breach the Express Terms of the Agreement**

DHL's argument centers on two provisions. First, the Agreement defines "[p]roducts and [s]ervices" as "all products and services currently offered by [DHL] to the small business market." Agreement § 1(a). Second, the obligations of DHL under the Agreement include the following: "[DHL] shall be responsible for servicing customers generated by this program in accordance with [DHL's] standard practices."

8

Id. § 5. DHL focuses on the terms "currently offered" and "standard practices" to argue that "at most, the Reseller Agreement gave ESI flexibility to resell whatever products and services DHL offered the small business market at any given time." DE 79 ¶ 17. DHL argues that this "flexibility" eliminated "the need to amend the Reseller Agreement every time DHL changed the products or services it offered." DE 78 at 3. "DHL was not obligated to continue to provide domestic express services, but rather only to service ESI's customers in accordance with its 'standard practices.'" DE 79 ¶ 17 (quoting Agreement § 5).

DHL further argues that ESI "cannot show that DHL has breached the express terms of the Reseller Agreement, and thus, [ESI's] contract claim is preempted." DE 58 at 7. DHL makes the following argument in support of this claim:

> [T]he Reseller Agreement does not require DHL to provide U.S. domestic shipping services, and [ESI] can point to no term of the contract that says that DHL must provide those services. Instead, DHL agreed that it would provide [ESI] and its customers with the same 'products and services currently offered by [DHL] to the small business market.' After January 30, 2009, the only service that DHL offered to the small business market was international package shipment.

Id. at 7-8 (emphasis in original) (citations omitted).

DHL contends that ESI's interpretation of the Agreement would result in an "absurd interpretation." DE 78 at 4. "Despite the plain meaning of these terms, ESI insists that the 'currently offered' language means that the parties were meant to remain frozen in time from the date that they signed the Reseller Agreement eight years ago and that DHL was obligated to provide the same services Airborne provided in 2001." Id.

The problem with DHL's argument is that the Agreement speaks to three areas

that are relevant to the facts of this case. That is the Agreement is scheduled run through December of 2010 and the Agreement sets forth the grounds upon which the Agreement may be terminated or modified. See Agreement §§ 6, 8(i). For example, a party may terminate the Agreement immediately if such party institutes bankruptcy proceedings. Id. § 6(a). In addition, the Agreement "may be amended only by a written instrument signed by the parties hereunder." Id. § 8(i). Viewing all evidence and drawing all reasonable inferences in favor of ESI, the Court concludes that the actions of DHL constitute either a termination or a modification of the Agreement. It is undisputed DHL did not meet the specific requirements laid out in the Agreement to accomplish either scenario.

Significantly, the Court need not look to state law to locate obligations which DHL did not fulfill. Therefore, ESI's counterclaims do not require an "enlargement or enhancement" of DHL's obligations "based on state laws or policies external to the agreement." Wolens, 513 U.S. at 233. Rather, DHL is attempting to use the law of preemption to diminish its obligations and enhance its rights under the Agreement. Essentially, DHL is asking the Court to rewrite the Agreement to include a provision that would allow DHL to terminate the Agreement, for any reason, upon thirty days notice. Indeed, such a clause is found in the agreement at the center of a case DHL relies on extensively. See A.I.B. Express, Inc. v. FedEx Corp., 358 F. Supp. 2d 239, 243 (S.D.N.Y. 2004) ("The agreement also provided that either party could terminate the agreement upon thirty days written notice."). A similar provision is not, however, found in the Agreement before this Court. As ESI argues, DHL's interpretation of the Agreement "renders the duration provision of the Agreement, which runs through

December 2010, meaningless." DE 69 at 7.

DHL attempts to support its interpretation that the Agreement allowed DHL to terminate its domestic services at any time by identifying places in the Agreement which contemplate changes "without notice." See DE 78 at 3-4.  For example, DHL points to Attachment A to the Agreement which is a pricing proposal that is "subject to . . . approval by [DHL's] pricing department." Agreement, Attachment A at 8.  DHL also highlights a schedule of "International Express Points Served" contained in Attachment A, which states at the bottom in small print that the schedule is "[s]ubject to change without notice." Id. at 15.  These minor points in Attachment A do not justify the expansive right DHL asks this Court to insert into the Agreement.  To the contrary, they reinforce the point that DHL could have negotiated for a provision in the Agreement to provide DHL with the right to discontinue its domestic shipping services prior to the Agreement's end date or to terminate the Agreement for any reason on thirty days notice.  The Court understands that the recent economic downturn has forced many companies to make painful decisions.  Nevertheless, a recession does not afford DHL the right to simply walk away from the Agreement irrespective of the terms contained therein.  Accordingly, the Court will deny DHL's Motion for Summary Judgment with respect to ESI's counterclaim sounding in breach of contract.

The Court will grant summary judgment on ESI's counterclaim for breach of the implied covenant of good faith and fair dealing.  Although the Court will allow ESI to go forward on its claim that DHL has breached the terms of the Agreement, ESI will not be permitted to rely on implied covenants, subject to varying interpretations by state courts, to broaden the explicit obligations contained in the Agreement.  See, e.g., A.I.B.

Express, Inc., 358 F. Supp. 2d at 253 (finding "claim of breach of the implied covenant of good faith and fair dealing is preempted because it seeks to add to the terms of FedEx's contractual obligations"). Alternatively, to the extent that ESI's counterclaim for breach of the implied covenant of good faith and fair dealing does not seek to enhance the terms of the Agreement, it is merely duplicative of ESI's breach of contract counterclaim.

### B. ESI's Counterclaim for Solicitation of Existing Customers

DHL cites several decisions holding that state law claims for tortious interference are preempted. See DE 78 at 9 (citing Lyn-Lea Travel Corp. v. Am. Airlines, 283 F.3d 282, 288 (5th Cir. Tex. 2002); Continental Airlines, Inc. v. United Air Lines, Inc., 120 F. Supp. 2d 556, 573 n.33 (E.D. Va. 2000); A.I.B. Express, Inc., 358 F. Supp. 2d at 254). The Court agrees with DHL that ESI may not bring such a claim based on state law. Nonetheless, although labeled as a claim for tortious interference, ESI's counterclaim is in part based on a breach of § 5 of the Agreement. Section Five includes a provision which states that "[d]uring the term of this Agreement, [DHL] will not . . . knowingly solicit the business or patronage of existing [ESI] accounts." Agreement § 5.

There is evidence on the record that DHL improperly solicited ESI's customers in February of 2009. See DE 87-1. DHL argues that it did not "solicit any business 'during the term of the Agreement,' because Express Save has alleged the termination of the Reseller Agreement occurred months before the alleged solicitation." DE 58 at 9. However, if ESI is able to establish that DHL breached the Agreement by ceasing its domestic shipping services, such a material breach would not result in a "termination" of the Agreement under its terms. Rather, ESI would have the authority to terminate the

Agreement if the breach was not cured within sixty days of written notice of the breach. Agreement § 6 ("in the event of a material breach of this Agreement that is not cured within sixty (60) days written notice of said breach, the <u>notifying party may</u> terminate this Agreement immediately") (emphasis added).

ESI faces significant obstacles to establish that the Agreement was still in force in February 2009. ESI is on record stating that the "Agreement was constructively and wrongfully terminated by DHL's anticipatory breach of the Agreement." DE 69-1 ¶ 10. Moreover, as discussed below, ESI ceased to provide payments under the Agreement. The Court cannot, however, say as a matter of law that the Agreement was terminated at the time of DHL's solicitation. Accordingly, ESI's counterclaim that DHL breached § 5 of the Agreement will survive summary judgment.

### 2.  **DHL's Motion for Summary Judgment on Its Contract Claims**

DHL moves for summary judgment on Counts I (breach of contract), II (account stated) and III (open account) of the Complaint in the amount $258,134.80. DHL argues that summary judgment "is proper because the Reseller Agreement between DHL and [ESI] requires [ESI] to pay the full amount of DHL's invoices for services. [ESI] has failed to pay for any of DHL's services since November or December 2008." DE 56 at 1.

DHL states that there is no dispute that (1) ESI customers have continued to ship packages through DHL's network, and (2) in November 2008, ESI decided to unilaterally stop paying DHL. As a result, ESI "has run up a debt in the amount of $258,134.80 that it flatly refuses to pay." Id. at 2.

In response, ESI argues that DHL's November 2008 announcement

"discouraged ESI's customers from continuing to utilize ESI's services, and the services that DHL provided to ESI's customers became unreliable." DE 70 at 2. According to ESI, "the DHL organization . . . became depleted and was therefore unable to adequately and timely respond to ESI's inquiries." Id. ESI asserts that the outstanding amount owed by ESI is "disputed" and that "[w]hen the facts of this litigation are ultimately resolved . . . DHL will owe ESI significantly greater sums of money as a result of its breach than the amount it claims against ESI." Id.

The Court concludes that there are disputed issues of material facts regarding the amount of DHL's damages. Accordingly, DHL's Motion for Summary Judgment on its Contract Claims will be denied.

## IV. CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Plaintiff's Motion for Summary Judgment on its Contract Claims [DE 56] is **DENIED**.

2.  Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims [DE 58] is **GRANTED in part and DENIED in part**.

    a.  The Motion is **GRANTED** with respect to Count II (breach of implied covenant of good faith and fair dealing) of ESI's Amended Counterclaims.

    b.  The Motion is **DENIED** with respect to Counts I (breach of contract) and X (wrongful solicitation) of ESI's Amended Counterclaims.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County,

Florida, on this 24th day of November, 2009.

/s/ James I. Cohn
JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF